IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

JEFFREY N. WATERS )
)
v. ) No. 2:08-0004
) Judge Wiseman/Bryant
SOCIAL SECURITY ADMINISTRATION )

To: The Honorable Thomas A. Wiseman, Jr., Senior Judge

### REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c), to obtain judicial review of the final decision of the Social Security Administration ("SSA" or "the Administration"), through its Commissioner, denying plaintiff's applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"), as provided under Titles II and XVI of the Social Security Act ("the Act"). The case is currently pending on plaintiff's motion for judgment on the administrative record (Docket Entry No. 15), to which defendant has responded (Docket Entry No. 18). Upon consideration of these papers and the transcript of the administrative record (Docket Entry No. 13), and for the reasons given below, the undersigned recommends that plaintiff's motion be **DENIED**, and that the decision of the SSA be **AFFIRMED**.

### I. Introduction

Plaintiff filed his DIB and SSI applications on August 26, 2004, alleging disability commencing June 15, 1997, due to blood clots in his leg. (Tr. 52-55, 71, 235-38)

1

Plaintiff's applications were denied at the initial and reconsideration stages of state agency review (Tr. 37-40, 43-46). Plaintiff thereafter requested a *de novo* hearing before an Administrative Law Judge ("ALJ"). The hearing was held on November 1, 2006 (Tr. 247-61). Plaintiff was represented by his current attorney at the hearing, and testimony was received from both plaintiff and an impartial vocational expert. During the hearing, in light of plaintiff's regular work activity after his original alleged disability onset date, the onset date was amended to June 30, 2004. (Tr. 250) After receiving all the testimony and closing the record, the ALJ took the case under advisement until February 2, 2007, when he issued a written decision denying plaintiff's claims to benefits. (Tr. 14-22) The decision contains the following enumerated findings:

1. The claimant met the insured status requirements under Title II of the Social Security Act as of his amended alleged disability onset date of June 30, 2004, and he continues to satisfy these requirements through at least the date of this decision.

2. The claimant has not engaged in substantial gainful activity (SGA) since June 30, 2004 (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3. The claimant has "severe" but non-disabling impairments due to an antithrombin-III (AT-III) deficiency, with intermittent discomfort in his left hip and leg (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals in severity any pertinent criteria for an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the modified medium residual functional capacity (RFC) (i.e., he can perform a modified but substantial range of medium work as defined in the regulations) that is specifically set forth below (20 CFR 404.1545/404.1567,

20 CFR 416.945/416.967, and SSRs 83-10/96-8p).

6. The claimant is capable of performing his past relevant work as specifically detailed below. Based on the qualified vocational expert's testimony at the hearing, it is found that the claimant's past relevant work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (RFC) (20 CFR 404.1565 and 416.965).

7. The claimant has not been under a "disability," as defined in the Social Security Act, from June 30, 2004 through at least the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 16, 17, 18, 21)

On November 9, 2007, the SSA's Appeals Council denied plaintiff's request for review of the ALJ's decision (Tr. 4-6), thereby rendering that decision the final decision of the Administration. This civil action was thereafter timely filed, and the court has jurisdiction. 42 U.S.C. §§ 405(g), 1383(c). If the ALJ's findings are supported by substantial evidence, based on the record as a whole, then those findings are conclusive. Id.

## II. Review of the Record

### A. Medical Evidence

Plaintiff has hereditary antithrombin-III deficiency ("AT-III"), "a genetic shortage of a protein in the liver that inhibits coagulation and limits the forming of blood clots." (Tr. 18) This condition can result in the development of a clot in a blood vessel, known as thrombosis, which if untreated can detach from the vessel wall and circulate in return to the lungs, resulting in a life threatening pulmonary embolism. In plaintiff's case, the medical record reveals one instance of deep venous thrombosis ("DVT"), which occurred

in 1997, when plaintiff was 25 years old. Plaintiff presented to the hospital with severe left leg pain, and upon discovery on ultrasound of the thrombosis in the mid aspect of his superficial femoral vein into the popliteal vein, he was admitted to acute care for intravenous anti-coagulation therapy with Heparin. (Tr. 138-40) Five days later, plaintiff was discharged home in stable condition, with a prescription for continued anti-coagulation therapy on the medication Coumadin. (Tr. 138) Plaintiff has been on Coumadin ever since.

Plaintiff began treatment with Dr. J. Lee Copeland, an internist, in March 2004. (Tr. 186) Dr. Copeland recorded plaintiff's past medical history as "hip DVT" and ordered a blood test to ascertain his Coumadin level. Id. Plaintiff's next visit to Dr. Copeland was on June 16, 2004, when plaintiff complained of severe pain in his left leg every evening after working all day outside cutting right-of-ways for the "Highway Department" and then coaching youth football after work. (Tr. 183) Examination of the left leg revealed "a trace of swelling" but "no redness or tenderness." Id. Plaintiff declined a venous ultrasound, as he did not feel that his pain was related to a blood clot. (Tr. 184) He was given samples of the anti-inflammatory Vioxx, and a prescription for Vicodin for the pain. Id.

In August 2004 plaintiff injured his right knee while coaching a football practice (Tr. 181). This injury to the medial meniscus eventually required arthroscopic surgery to repair. In October 2004, plaintiff's medical records were reviewed by a consultant to the state office of Disability Determination Services, Dr. Frank Pennington (Tr. 166-71). In view of plaintiff's recent knee injury and surgery, Dr. Pennington assessed plaintiff's residual functional capacity as he expected it to be by August 11, 2005, one year after plaintiff's torn meniscus was revealed. Dr. Pennington expected plaintiff's knee pain to have

4

resolved by that time, and opined that he would be capable of medium exertion, i.e., lifting/carrying 50 pounds on an occasional basis, 25 pounds on a frequent basis, and sitting, standing, and walking 6 hours each out of an 8-hour day (Tr. 167, 171). He further assessed a limitation against more than frequent pushing and/or pulling with the right leg (Tr. 167).

Dr. Copeland next saw plaintiff for complaints of left leg pain in December 2004, and his prescription for Lortab[1] was refilled (Tr. 177). Dr. Copeland continued to monitor plaintiff's Coumadin level and his leg pain in early 2005 (Tr. 172-76). In March 2005, Dr. Copeland ordered a venous ultrasound of plaintiff's left lower leg, which revealed the following: "Incomplete compressibility of the left popliteal vein, although there is normal venous flow through the popliteal vein with normal augmentation present. This is probably an old thrombus along the popliteal wall. There is no acute thrombus and no femoral vein involvement." (Tr. 190)

There is no further record of treatment by Dr. Copeland until April 2006, when it was noted that plaintiff complained of continuing leg/hip pain. Plaintiff's leg was noted to be swollen. He reported that his medications continued to help and he denied side effects or seeing any other doctors. (Tr. 225) On May 16, 2006, plaintiff had run out of Coumadin and complained of more severe pain in his leg/hip. (Tr. 224) His blood pressure that day was elevated, and hypertension was diagnosed; Dr. Copeland prescribed Lisinopril. Id. On June 6, 2006, plaintiff was seen for a checkup regarding his Coumadin level and for refill of his Lortab, which continued to help, without side effects. Plaintiff's Lisinopril dose was increased at this visit. (Tr. 223) On June 23, 2006, plaintiff was seen at Dr. Copeland's

---

[1]Both Lortab and Vicodin are painkilling drugs that combine the narcotic hydrocodone with acetaminophen. See http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601006.html.

clinic "stating that over the past few days he has been working outside and he states he sweats profusely and he has had some dizziness and gets really weak, his muscles have been cramping. He states sometimes he feels tingly and he feels that his heart races. This has been just this week. He has noticed no weakness in either extremity, he said he just feels tired." (Tr. 220) Physical examination was normal. Plaintiff was advised to drink Gatorade daily when he was outside, and to avoid extremely hot weather; he was sent home "to just rest and take it easy over the next couple of days." (Tr. 221)

In July 2006, plaintiff was seen twice by Dr. Copeland for medication refills and once for a Coumadin level. Physical examination was normal at both visits. (Tr. 218, 219)

On August 1, 2006, Dr. Copeland submitted a medical source statement of plaintiff's work-related abilities (Tr. 214-17). He opined that plaintiff had a 20-pound limit on lifting or carrying, and could stand or walk for about 6 hours out of an 8-hour workday. (Tr. 214) Plaintiff was assessed as having no limitation on sitting, but had an unspecified limitation on pushing and/or pulling with the lower extremities. (Tr. 214-15) Plaintiff was also determined to require an option to periodically sit and stand in order to relieve discomfort. (Tr. 215) Dr. Copeland went on to state that plaintiff experienced pain that was often severe enough to interfere with attention and concentration, would need unscheduled work breaks roughly every two hours, and would need to elevate his legs with prolonged sitting. Id. Dr. Copeland also estimated that plaintiff would experience bad days requiring him to miss work more than four times per month. Id.

On August 25 and September 15, 2006, plaintiff was seen for regular medication refills and Coumadin levels. (Tr. 231, 232) On October 5, 2006, plaintiff

6

complained that his pain medication was not helping very well, and swelling of his leg was noted. Dr. Copeland increased the dosage of plaintiff's Lortab prescription. (Tr. 230)

## B. <u>Testimonial Evidence</u>

Plaintiff was 34 years old at the time of his hearing, with a high school education and past relevant work as an assembly line worker, HVAC installer, carpenter, and welder (Tr. 249-50). He testified that he had pain in his left leg from groin to toe. (Tr. 250) His prescription medications included Lortab for pain, Coumadin, and Lisinopril. (Tr. 251) He testified that he could walk 200 yards, could stand 20-30 minutes at a time, with a lot of swelling and pain, could lift 20 pounds, and could sit for between an hour and an hour and a half (Tr. 251-52). He testified that the severity of his pain varied, but that when he had attacks of muscle cramps at night, the pain was a 10 on a 10-point scale (Tr. 252). He testified that hot weather brought on his nighttime attacks (Tr. 253-54). He attempted to return to his past work as a trimmer with a company called Seelbach between May and July of 2005, but was unable to sustain that work activity due to his pain (Tr. 254). Beginning in July 2006, plaintiff had established a business spraying water sealant on concrete basement walls (Tr. 255). His wife and son were helping with the business, but he had secured only two jobs, one of which took 2 days to complete and the other of which took 2 weeks to complete. These completion times were based on the size and complexity of the jobs. (Tr. 255-56). Plaintiff testified that he could not make it on 2 jobs in 4 months, and that he was trying to advertise as much as he could in order to get his name established (Tr. 259).

Plaintiff testified that if it is warm outside and he tried to do anything physical for two or three hours at a time, he would have severe cramps at night resulting in his being unable to walk for up to three days thereafter. (Tr. 256) He testified that his left leg stays

7

swollen, and that the extent of the swelling depended on how much time he spent up on it. (Tr. 256-57) Three or four times per month, the swelling would be so bad that it caused difficulty in putting on a pair of pants. (Tr. 257) He stated that he had some black and blue discoloration in the leg all the time. Id. He kept his leg elevated every night while sleeping (Tr. 257-58). He testified that every hour to an hour and a half during the day, he would have to lie down and elevate his leg for between 10 and 30 minutes (Tr. 258). He testified that he had seen a specialist who advised against performing surgery on the leg (Tr. 259).

The vocational expert testified that a person with plaintiff's vocational profile and the limitations assessed by the nonexamining consultant, Dr. Pennington, along with a moderate level of pain and moderate loss of concentration, could perform plaintiff's past relevant assembly, welder, and carpentry work (Tr. 260). She testified that a person with the same profile, but limited as described in Dr. Copeland's assessment, could not perform any of these jobs, due to the level of pain and need for unscheduled breaks described in that assessment. Id.

### III. Conclusions of Law

#### A. Standard of Review

This court reviews the final decision of the SSA to determine whether that agency's findings of fact are supported by substantial evidence in the record and whether the correct legal standards were applied. Elam ex rel. Golay v. Comm'r of Soc. Sec., 348 F.3d 124, 125 (6th Cir. 2003). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th

8

Cir. 2007)(quoting Cutlip v. Sec'y of Health & Human Servs., 25 F.3d 284, 286 (6th Cir. 1994)). Even if the evidence could also support a different conclusion, the SSA's decision must stand if substantial evidence supports the conclusion reached. Her v. Comm'r of Soc. Sec., 203 F.3d 388, 389 (6th Cir. 1999).

### B. Proceedings at the Administrative Level

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Id. at § 423(d)(3). In proceedings before the SSA, the claimant's case is considered under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

> 1) A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.
>
> 2) A claimant who does not have a severe impairment will not be found to be disabled.
>
> 3) A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four.
>
> 4) A claimant who can perform work that he has done in the past will not be found to be disabled.
>
> 5) If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be

considered to determine if other work can be performed.

<u>Cruse v. Comm'r of Soc. Sec.</u>, 502 F.3d 532, 539 (6th Cir. 2007)(<u>citing</u>, <u>e.g.</u>, <u>Combs v. Comm'r of Soc. Sec.</u>, 459 F.3d 640, 642-43 (6th Cir. 2006)(en banc)); 20 C.F.R. §§ 404.1520(b)-(f), 416.920 (b)-(f).

The SSA's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grids," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. <u>See</u> <u>Wright v. Massanari</u>, 321 F.3d 611, 615-16 (6th Cir. 2003). Otherwise, the grids cannot be used to direct a conclusion, but only as a guide to the disability determination. <u>Id.</u>; <u>see also</u> <u>Moon v. Sullivan</u>, 923 F.2d 1175, 1181 (6th Cir. 1990). In such cases where the grids do not direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert ("VE") testimony. <u>See</u> <u>Wright</u>, 321 F.3d at 616 (<u>quoting</u> Soc. Sec. Rul. 83-12, 1983 WL 31253, *4 (S.S.A.)); <u>see also</u> <u>Varley v. Sec'y of Health & Human Servs.</u>, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity ("RFC") for purposes of the analysis required at steps four and five above, the SSA is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. <u>See</u> 42 U.S.C. §§ 423(d)(2)(B), (5)(B); <u>Foster v. Bowen</u>, 853 F.2d 483, 490 (6th Cir. 1988).

C. <u>Plaintiff's Statement of Errors</u>

10

Plaintiff argues for reversal of the ALJ's decision on two grounds: (1) that his rejection of treating physician Dr. Copeland's assessment is not supported by substantial evidence, and (2) that his finding of plaintiff's lack of credibility is likewise unsupported. As further explained below, the undersigned finds that, based on the record before him, the ALJ's rejection of Dr. Copeland's assessment is substantially supported. Moreover, the evidence of record substantially supports the ALJ's credibility finding. Thus, it is recommended that the agency decision in this case be affirmed.

Key among the evidentiary standards that bind Social Security ALJs is that greater deference is generally owed the opinions of treating physicians than those of nontreating physicians. Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 242 (6th Cir. 2007). When such opinions are sufficiently supported and not substantially opposed, they are entitled to controlling weight. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Even when such opinions are not controlling, "in all cases there remains a presumption, albeit a rebuttable one, that the opinion of a treating physician is entitled to great deference ..." Rogers, 486 F.3d at 242. "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records." Barker v. Shalala, 40 F.3d 789, 794 (6th Cir. 1994).

In the case at bar, the ALJ analyzed two medical assessments of plaintiff's work-related capabilities: that of Dr. Copeland (rendered in August 2006) and that of Dr. Pennington, a nonexamining state agency consultant (rendered in October 2004). The ALJ

11

concurred with Dr. Pennington's assessment of plaintiff's exertional capacity for medium work, rejecting Dr. Copeland's assessment of only light exertional capacity. More critically, the ALJ sided with Dr. Pennington when it came to plaintiff's ability to endure work activity without requiring a sit/stand option, and rejected Dr. Copeland's assessment that plaintiff not only required such an option, but also required unscheduled work breaks and the ability to elevate his left leg with prolonged sitting. Finally, the ALJ rejected Dr. Copeland's assessment that plaintiff often experienced pain severe enough to interfere with his concentration, and that plaintiff's symptoms would force him to miss more than four workdays per month. The divergence between these two medical assessments is partially attributable to the gap in time between them. At the time of Dr. Pennington's assessment, plaintiff had been unable to work for only a few months, and his primary limitation was from torn meniscus in his right knee (Tr. 166). On account of that injury, the subsequent surgery, and an expected course of postsurgical improvement with continued medical therapy, Dr. Pennington assessed plaintiff's abilities as he expected them to be on August 11, 2005, when plaintiff's right knee pain would be expected to have resolved. (Tr. 166, 171) Thus, Dr. Pennington's assessment of medium exertional capability appears to have been made in light of the baseline level of pain in plaintiff's left leg, consistent with the ALJ's determination.

The restrictions given by Dr. Copeland were explained in his medical source statement, as follows: "Pt has a blood clot in [left] hip/pelvic area. He experience[s] swelling & pain particularly in summer [with] the heat. He is on Coumadin → was trimming trees, but is unable to perform this type work" (Tr. 215). While the ALJ recognized plaintiff's AT-

12

III deficiency and his history of DVT among his medically determinable impairments which could reasonably be expected to produce the alleged symptoms, i.e., pain and swelling (Tr. 21), he reasonably noted the large extent to which Dr. Copeland's medical source statement departs from his treatment notes, wherein plaintiff's left leg/hip pain is routinely noted, but appears for the most part to be adequately controlled by the same dose of Lortab, which reportedly continued to help without side effects (Tr. 223, 225, 231), at least until October 2006, when the Lortab dosage was increased (Tr. 230). Dr. Copeland's notes largely reflect nothing remarkable upon examination of plaintiff's extremities, or that his extremities are within normal limits; on two occasions in 2006, plaintiff's left leg was noted to be swollen (Tr. 225, 230). Otherwise, Dr. Copeland's notes only reflect his monitoring of plaintiff's ongoing anticoagulant therapy, by testing the international normalized ratio ("INR") of his Coumadin dose. They do not reveal any clinical findings which would support the light lifting restriction or the other restrictions assessed by Dr. Copeland in August 2006.

In addition to considering that these treatment notes do not provide objective support for the level of pain assessed by Dr. Copeland, the ALJ appears to have considered the possibility that plaintiff's venous sufficiency was impaired by his episode of DVT, in that he analyzed plaintiff's treatment history against the listing for chronic venous insufficiency, § 4.11 of Appendix 1 to 20 C.F.R. Pt. 404, Subpt. P. (Tr. 18) Though not mentioned in Dr. Copeland's records, plaintiff testified to discoloration in his left leg consistent with poor circulation. (Tr. 119, 257) However, chronic venous insufficiency has not been diagnosed by any source of record, and any discoloration in plaintiff's left leg is not itself significant apart from plaintiff's experience of pain in the leg. The ALJ rightly observed that the

13

objective medical record includes an ultrasound duplex venous study obtained in March 2005, which "while indicating an old thrombus, nonetheless confirmed that there was no active thrombus and that there was normal blood flow through the left popliteal vein with normal augmentation."  (Tr. 19, 190)[2]  Thus, the undersigned finds substantial evidentiary support for the ALJ's rejection of Dr. Copeland's assessment as "not accompanied by corroborating laboratory and clinical findings and . . . inconsistent with the laboratory and clinical findings provided in his own treatment notes. . . ."  (Tr. 19)

With regard to plaintiff's second argument, it is clear that an ALJ may properly consider the claimant's credibility when analyzing that individual's level of impairment from subjective symptoms, and great deference is owed to such determinations of credibility. Warner v. Comm'r of Soc. Sec., 375 F.3d 387, 392 (6th Cir. 2004). "The claimant's credibility may be properly discounted 'to a certain degree . . . where an [administrative law judge] finds contradictions among the medical reports, claimant's testimony, and other evidence.'" Id. (quoting Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 531 (6th Cir. 1997)).  While the ALJ here ultimately determined that a moderate level of pain was credibly suggested by the record, he made no bones about his dim view of plaintiff's complaints of pain so severe as to prevent standing or sitting for more than very brief periods of time, noting that such

---

[2]The undersigned would further note that Dr. Copeland makes reference to a blood clot in plaintiff's "hip/pelvic area," and noted plaintiff's past medical history of "hip DVT" from his very first visit with plaintiff (Tr. 186).  However, the venous ultrasound ordered by Dr. Copeland in March 2005 was based on plaintiff's history of "left lower leg pain," and visualized the popliteal vein, which is behind the knee.  See http://www2.merriam-webster.com/mw/art/med/vein.htm.  This, of course, is consistent with plaintiff's 1997 DVT in the "mid aspect of the superficial femoral vein into the popliteal vein." (Tr. 140)  As far as the undersigned can determine, there is no record evidence of plaintiff ever experiencing thrombosis in the hip/pelvic area.

14

complaints "are obviously exaggerated, extremely self-serving, and . . . out of proportion to the severity of his medically determinable impairments as established by the objective medical records herein." (Tr. 20) In support of this finding, the ALJ cites plaintiff's lack of blood clots since being placed on Coumadin, and the fact that he opened his own business of watersealing basements in July 2006.[3] The ALJ further cites plaintiff's level of daily activity, as well as a treatment note of Dr. Copeland's which reflects that, in the same month as plaintiff alleged the onset of disability, he complained of leg pain such that he could not stand after his day was done, although his days were spent being very active, working outside "cutting [right-of-ways] for the Highway Department" and then coaching a youth football team. (Tr. 183-85)[4] While the undersigned is not impressed with the citation of plaintiff's daily activities -- which include occasionally taking his sons to fish from a stream, grocery shopping, operating his computer, doing light cooking, and attending church once a month (Tr. 20, 252-53) -- as support for the ALJ's credibility finding, that finding is otherwise supported by the substantial medical and nonmedical evidence identified.

        In light of the substantial evidentiary support for the ALJ's rejection of Dr. Copeland's opinion and his discounting of plaintiff's subjective complaints, and giving the ALJ's credibility finding the deference it is due, the undersigned must conclude that the

---

[3] Plaintiff testified that this business involves his use of "a drywall hopper where I do, you know, actually do spraying. I spray a product onto the concrete that -- in order to seal the concrete." (Tr. 255) He further testified that the time it took him to complete the sealing process depended on the size and complexity of the job (Tr. 256).

[4] Although not mentioned by the ALJ, another note of Dr. Copeland's, dated June 23, 2006, reflects plaintiff's complaint of dizziness and muscle cramps while working outside "over the past few days" (Tr. 220). That note reflects no significant swelling of plaintiff's extremities. Id.

agency decision in this case should be affirmed.

### IV. Recommendation

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be **DENIED**, and that the decision of the SSA be **AFFIRMED**.

Any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

**ENTERED** this 30th day of January, 2009.

                                                s/ John S. Bryant
                                                JOHN S. BRYANT
                                                UNITED STATES MAGISTRATE JUDGE